NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TYREN T., BRITTANY H., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, S.T., T.T., R.T., J.T., *Appellees*.

No. 1 CA-JV 16-0091
FILED 8-25-2016

Appeal from the Superior Court in Maricopa County
No. JD31109
The Honorable Connie Contes, Judge

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant Tyren T.*

Law Office of Bernard P. Lopez, Goodyear
By Bernard P. Lopez
*Counsel for Appellant Brittany H.*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Chief Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Patricia A. Orozco and Judge Samuel A. Thumma joined.

---

**B R O W N**, Chief Judge:

¶1        Tyren T. ("Father") and Brittany H. ("Mother") (collectively, "Parents") appeal the juvenile court's order adjudicating their four children dependent.  Parents argue the court erred by failing to make specific findings of fact.  Father also asserts there is insufficient evidence supporting a finding of dependency.  For the following reasons, we affirm.

## BACKGROUND

¶2        Father and Mother are the biological parents of S.T. (born 2012), T.T. (born 2014), and twins, R.T. and J.T. (born 2014).  The twins were born prematurely, at twenty-four weeks' gestation, weighing 1.7 and 1.8 pounds, respectively.  They had significant medical complications, and were hospitalized in the neo-natal intensive care unit ("NICU") for six months.  After being home with Parents for three months, on August 6, 2015, R.T. was admitted to the hospital for "failure to thrive," vomiting, diarrhea, dehydration, and fever.  As a result of his hospitalization, the Department of Child Safety ("DCS") received a report on August 11, 2015 alleging neglect of R.T.

¶3        Mother attended a team decision meeting, but Father did not, apparently choosing not to participate in the meeting or the DCS investigation.  DCS immediately took R.T. into temporary custody while hospitalized; however, Mother refused to allow DCS access to the other children.  She also refused to provide contact information for Father.  On August 21, 2015, DCS filed (1) a dependency petition pursuant to Arizona Revised Statutes ("A.R.S.") section 8-201(14)(a) as to all four children and (2) a motion for pickup of S.T., T.T., and J.T.  The petition alleged that (1) Parents neglected the children because they allowed R.T. to become malnourished and dehydrated, have a history of refusing medical treatment for their children, and hid the other three children; and (2) Mother failed to properly treat her mental health issues.  At the initial dependency hearing, the court considered DCS' report alleging Mother refused to follow medical instructions for the children despite repeated

warnings, including the danger of giving R.T. water due to the risk posed to a premature infant, and allowing R.T. to sleep on his stomach which could increase the risk of sudden infant death syndrome.

¶4            DCS requested that Parents participate in parent aide services, psychological evaluations, and counseling services, and the juvenile court approved a case plan of family reunification with a concurrent plan of severance and adoption for the youngest three children. R.T. was discharged from the hospital on August 24, 2015, and placed in a foster home that could provide for his significant medical needs. At the time of discharge, R.T. had been immunized, gained weight (from 1st percentile to 50th percentile), and was able to roll over. After concealing the other three children for five weeks, Parents eventually surrendered them to DCS. All four children were then placed with maternal grandparents and Parents were offered supervised visitation. Once under DCS care, it was discovered that none of the other children were current on immunizations and the twins required considerable medical and social intervention, including care from neurologists, cardiologists, ophthalmologists, gastroenterologists, and physical and occupational therapists.

¶5            Mother received a psychological evaluation from Dr. Martig in October 2015. She was diagnosed with post-traumatic stress syndrome with strong distrustful states and patterns of anxiety. At both the team meeting and during her session with Martig, Mother reported she was sexually abused as a child, removed from her parent's home, and then moved to multiple foster homes. DCS later learned Mother's report was false; no documentation of abuse or child protective services involvement existed and Mother's parents denied she was ever removed from the home. Upon learning this, Martig modified his recommendations and diagnosis, opining that Mother is likely suffering from depression as well as anxiety, may be putting herself forward as a victim to protect herself from feeling overwhelmed in regards to her responsibilities with her children, and may need longer treatment intervention. He also recommended Mother receive parenting classes and supportive counseling. Mother later denied she ever told Martig or DCS any such story. Further, Mother reported she has her own medical problems, especially asthma. Martig opined that Mother has strong feelings of helplessness and is often pessimistic about the future, especially when she is involved with her children in a medical environment, which can then trigger conflict with medical personnel.

¶6            As of January 2016, DCS reported that all four children were doing well in placement—the twins had gained significant weight and their

medical needs were being met, Parents were fully engaged with services, including counseling and parenting classes, maintained good communication with the case manager, were making progress, and Parents' supervised visits with the children were appropriate. Parents also tested negative for drugs and alcohol. However, DCS remained concerned for the children's welfare because the case had been pending for less than six months, and Parents had a history of not providing effective medical care to the children.[1]

¶7 In January 2016, the court held a two-day contested dependency adjudication hearing, at which only Mother and Father testified. Father admitted that Mother primarily takes care of the children because he works full time. He stated that he has attended one doctor's appointment for the twins, asserted they have no special needs, and noted he is unaware of any medical specialists they require. He acknowledged he made a choice not to review the twins' medical records because Mother tells him everything and he trusts her to take care of them, including feeding them while he is at work.

¶8 Mother testified that the twins had severe medical complications due to their premature birth. R.T. had seizures and surgery to remove part of his bowel, necessitating continued treatment by a gastroenterologist. J.T. had seizures and a stroke, resulting in the loss of part of his brain. Additionally, the twins have issues with their eyes, J.T. has a feeding tube, and R.T. will have problems with his bones. Even so, Mother claimed that her children do not have special needs and she does not feel they need the physical and speech therapy they currently receive. Mother said she is trained on cleaning and replacing J.T.'s feeding tube, as well as feeding both twins. She testified she feeds them every three hours without difficulty and R.T. has never missed a meal. Contrasting Father's testimony that he is unaware of any specialists the twins must see, Mother stated she has told Father about all the children's medical issues.

---

[1] For example, DCS received a report that while the twins were hospitalized in the NICU after their premature birth, Parents were not visiting them. Mother told hospital staff she was ignoring their calls because she was depressed and did not want to hear about what was happening with the twins. DCS investigated, found S.T. and T.T. were clean and at a healthy weight, and there was no indication of domestic violence in the home. Parents refused DCS family preservation services at that time and did not attend a team decision meeting that was scheduled in May 2015. Three months later, DCS received the current report.

**¶9**        Father and Mother each testified that although R.T. has gained significant weight in the months he has been out of their care and they visit with him regularly, they do not see a difference in his appearance. At the time of the hearing, Parents were attending counseling sessions. Father stated that while he values speaking with someone about life in his twice weekly counseling sessions, he has learned nothing new about parenting.   Mother testified she has attended three of the twenty recommended sessions and wants to continue.

**¶10**        Following the presentation of evidence and closing arguments, the juvenile court issued a signed minute entry finding the children dependent as to Parents, stating that DCS "met its burden of proof by a preponderance of the evidence that the allegations of the petition are true."   Father and Mother then separately appealed from the dependency order.

## DISCUSSION

### A.        Sufficiency of Findings

**¶11**        The Arizona Rules of Procedure for Juvenile Court require the court to "[s]et forth specific findings of fact in support of a finding of dependency."  Ariz. R.P. Juv. Ct. 55(E)(3); *see also* A.R.S. § 8-844(C) (stating that the juvenile court "shall" enter "[t]he factual basis for the dependency").  Here, the juvenile court's minute entry merely stated that DCS proved by a preponderance of evidence that the "allegations of the petition are true."

**¶12**        Parents argue that the juvenile court erred by failing to make specific findings of fact, thereby precluding them from effectively refuting the grounds for the court's dependency finding.  DCS counters that Parents have waived this argument because it is raised for the first time on appeal.

**¶13**        As a general rule, we will not address an issue raised for the first time on appeal, "particularly [] as it relates to the alleged lack of detail in the juvenile court's findings." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 21 (App. 2007) (citations omitted).  "[A] party may not sit back and not call the trial court's attention to the lack of a specific finding on a critical issue, and then urge on appeal that mere lack of a finding on that critical issue as a grounds for reversal."  *Id*. (quoting *Bayless Inv. & Trading Co. v. Bekins Moving & Storage Co.*, 26 Ariz. App. 265, 271 (1976)).  Parents did not bring the issue of insufficient findings of fact to the juvenile court's attention, where it could have been promptly addressed.  Instead, they waited to introduce such concerns until months had passed since the

dependency was adjudicated, which "needlessly injects uncertainty and potential delay into the proceedings, when important rights and interests are at stake and timeliness is critical." *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178–79, ¶ 16 (App. 2014). Addressing a procedural error for the first time on appeal is also inconsistent with the overarching purpose of the dependency statutes and rules—ensuring that all actions taken are in the children's best interests. *See Joshua J. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 417, 423, 424, ¶¶ 17, 29 (App. 2012) ("[I]f dependency is proven, a prompt adjudication enhances finality and a child's stability by more quickly initiating either reunification efforts or termination proceedings," thereby protecting "the best interest of the child."); *Antonio P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 402, 404, ¶ 8 (App. 2008) ("[T]he court's primary consideration in dependency cases is the best interest of the child."); *Ariz. Dep't of Econ. Sec. v. Lee*, 228 Ariz. 150, 153, ¶ 15 (App. 2011) ("[T]he juvenile court's chief concern, and the overarching purpose of the governing statutes and Rules, is to protect the child's health and safety.").

**¶14** Furthermore, "absent extraordinary circumstances, errors not raised in the trial court cannot be raised on appeal" because "a trial court and opposing counsel should be afforded the opportunity to correct any asserted defects[.]" *Trantor v. Fredrikson*, 179 Ariz. 299, 300–01 (1994). Extraordinary circumstances are errors equivalent to fundamental error. *See id.* When no objection is made, we review non-compliance with the juvenile court procedural rules (i.e., failure to make specific findings of fact) for fundamental error. *Monica C. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 89, 94, ¶ 22 (App. 2005) (citations omitted). To establish fundamental error, Parents must show that the error "goes to the foundation of [their] case, takes away a right that is essential to [their] defense, and is of such magnitude that [they] could not have received a fair trial." *Id.* Parents must also establish they were prejudiced by such error. *Id.* at 95, ¶ 25.

**¶15** Without question, findings of fact and conclusions of law are helpful for appellate review, but "they do not go to the foundation of the case or deprive a party of a fair hearing." *Trantor*, 179 Ariz. at 300–01. Further, Parents have not established they were prejudiced by the juvenile court's failure to make specific findings of fact and our review of the record indicates they had a fair hearing. Parents were represented by counsel and afforded the opportunity to testify, present documentary evidence, and cross-examine witnesses. Parents have therefore failed to establish that fundamental error occurred by the court's failure to include express findings of fact.

**¶16**        Notwithstanding our decision to find waiver here, we urge strict compliance with Rule 55(E). *See Ruben M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz. 236, 240, ¶ 24 (App. 2012) ("The primary purpose for requiring a court to make express findings of fact and conclusions of law is to allow the appellate court to determine exactly which issues were decided and whether the lower court correctly applied the law."). The requirement that the juvenile court include specific findings of fact in a signed order or a minute entry is prevalent throughout the rules that govern the procedures for handling dependency and termination hearings. *See* Ariz. R.P. Juv. Ct. 50–66. Moreover, in addition to aiding appellate review, the inclusion of specific findings establishes a baseline against which the court can measure the progress of a parent's efforts to regain custody of his or her child. *See e.g.*, A.R.S. § 8–533(B)(8)(c) (describing as a partial ground for termination that "the parent has been unable to remedy the circumstances that cause the child to be in an out-of-home placement"); *cf. Reid v. Reid*, 222 Ariz. 204, 209, ¶ 18 (App. 2009) ("The rationale for this requirement is not simply to aid appellate review . . . but also to provide the family court with a necessary 'baseline' against which to measure any future petitions by either party based on 'changed circumstances.'").

### B.        Sufficiency of Evidence

**¶17**        Father also argues the juvenile court erred because there was insufficient evidence to support a dependency finding.[2] To decide whether a child is dependent, the juvenile court must consider those circumstances existing at the time of the adjudication hearing. *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016). As the trier of fact, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't*

---

[2]        Mother does not challenge the sufficiency of the evidence and thus she has waived that argument on appeal. *See* ARCAP 13(a)(7)(A) (mandating appellant's argument in the opening brief include "contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies."). However, because Mother is the primary caregiver and assumes responsibility for all the medical needs of the children, her ability to exercise proper and effective parental care of the children is highly relevant in determining whether DCS presented sufficient evidence to support the juvenile court's dependency finding as to Father.

*of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). We review a dependency adjudication for abuse of discretion and accept the court's determination unless no reasonable evidence supports it. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015) (citations omitted).

**¶18** A "dependent child" is one who is "[i]n need of proper and effective parental care and control and who has no parent . . . willing to exercise or capable of exercising such care and control" or one "whose home is unfit by reason of" neglect. A.R.S. § 8-201(14)(a). Neglect is "[t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter, or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(24)(a).

**¶19** As detailed above, Parents have failed to provide effective medical care to the children. Such instances include Parents allowing R.T. to become malnourished to the point he was diagnosed with failure to thrive, and Mother refusing to follow medical recommendations despite repeated warnings. The twins have serious medical issues, which will require ongoing and frequent medical care, as well as special care at home.

**¶20** As of the dependency hearing in January 2016, the children had been in DCS custody for less than six months; R.T. for five months and the other children for three months. The twins, 13 months old at the time, were receiving treatment from several specialists. For example, J.T. was under the care of a neurologist to address possible brain deficiencies and the need to be fitted for a helmet. R.T. continued to have numerous gastrointestinal issues, requiring constant monitoring of his weight. Both twins were developmentally delayed and receiving services from the Department of Developmental Disabilities. By January 2016, the children had been out of Parent's home for several months—removed for allegations of medical neglect. Yet, as Father admitted, he still had not reviewed their medical records. He explained that he trusts Mother to take care of them and relies on her to care for them because he works full time.

**¶21** Mother testified that in addition to giving birth to the children, she has had three miscarriages. As of the dependency hearing, Mother testified that she is pregnant with twins, but did not know her due date. She also testified she recently started working two jobs. These four children are very young and vulnerable, particularly the twins, and would be completely dependent upon Parents for care and protection.

¶22        Further, Martig opined that Mother is likely suffering from depression as well as anxiety, may be putting herself forward as a victim to protect herself from feeling overwhelmed in regards to her responsibilities with her children, and may need longer treatment.  At the time of the dependency hearing, Mother had participated in three counseling sessions. DCS was concerned that it was too early in the process to return the children to Parents because, in part, Mother's mental health issues were preventing her from properly caring for the children.

¶23        On this record, we cannot say the juvenile court abused its discretion in granting the dependency petition.  The record contains reasonable evidence showing that both Father and Mother were unable or unwilling to provide effective medical care for the children, which caused an unreasonable risk of harm to the children's health and welfare.

## CONCLUSION

¶24        The juvenile court's order finding the children dependent as to Parents is affirmed.



Amy M. Wood • Clerk of the court
FILED:  AA